Good morning, and may it please the Court, I'm Eric Christensen, representing the petitioner's Blocktree Capital et al. I'd like to reserve five minutes of my time for rebuttal. Please watch the clock. The District Court's failure to grant a preliminary injunction in this case was an abuse of discretion for a number of reasons. First, the District Court abused its discretion in concluding that the plaintiffs were unlikely to succeed on the merits. To start with, the District Court's decision doesn't even mention the EIQ policy. The EIQ policy puts the plaintiffs— Forgive me for interrupting, but basically, as I understand your position, it is that you're being overcharged in a way that violates the law in numerous respects. So if that were all, it would not support injunctive relief because it's a claim ultimately for damages and you could get a refund from any overcharge if you prevail the trial. And your response to that, as I understand it from your papers, is, well, this might drive the company into bankruptcy, but it's, you know, you don't support that other than as a speculation. And the trial of this case is, if I'm not mistaken, coming up in a few months. So it's hard for me to see why this is not really a matter of damages and therefore not supportive of injunctive relief. So to start with, Your Honor, it's not mere speculation that the plaintiffs here would be forced into bankruptcy by these extreme rate increases, which are increases on their most the declarations that were submitted to the district court demonstrate that bankruptcy is very likely the result of these. This can't be—or damages are not going to be an adequate remedy because by the time this trial is completed, the bankruptcy would likely already have occurred. And all we're required to prove to demonstrate the harm prong of the preliminary injunction is that irreparable harm is likely to occur. And it's very clear that bankruptcy or insolvency of a business is an irreparable harm because once the business is gone, the damages, the refunds in this case, are not sufficient to restore the business. Was there any finding by the judge that you would be likely to go into bankruptcy? So the judge just said our declarations were conclusory, whatever that means, but they're not conclusory. I know what conclusory means. You must know what conclusory means. It's a term used in the law all the time. Why were your declarations not conclusory? Because the declarations are from the actually affected parties who have the most direct knowledge of the status of their business, the cost of the inputs. Did they set forth an economic analysis in detail of exactly why this would drive you into bankruptcy? The analysis is that these are the most important input costs for these businesses, that these would place the businesses at an impossible economic disadvantage as compared to competition in areas with less expensive utility rates, and that would force the close. Sounds conclusory to me. So I don't know how much more detail could be provided, Your Honor. You could set forth here is the expenses we previously had. Here is income. Here's what we have in the way of net worth. Here's how this would affect it. An accountant could probably do this in a fairly short time, but nothing like that was presented, correct? Well, there's certainly a quantification of exactly how much the increase in rates would be. It's very clear that these are smaller businesses that are operating just in Grant County or in a few places around the country, and that the rate increases would not be bearable by these companies. Go ahead. And so, again, the standard is just that you have to show a likelihood of irreparable harm, not that it's definite or that there's some specific quantity of proof that has to be provided. It just has to be that it's likely that you'll suffer irreparable harm, and I think the declarations in this case clearly meet that standard. In terms of the specifics of the rate increase, there's several elements of the rate increase, at least two of which are unsupportable on the record. First, the plaintiffs are required to pay a cross-subsidy element, which is simply a transfer of wealth from plaintiffs to the favored customers of the PUD that increases the rate by itself by 32 percent. There's no factual justification for this. Well, you know, I mean, I understand your argument, but why isn't it a factual justification that we have these potentially hundreds of these currency miners coming in, that this could increase the power requirements from 600 megawatts to 1,500 megawatts? This is going to require all sorts of costs and all sorts of infrastructure changes, and it's fair to make those who are potentially causing this pay for that. I mean, reasonable people might come to another approach, but what is it that is arbitrary about those factual type determinations by a rate maker? So with respect to this specific element, this is purely a cross-subsidy. The risks that you're talking about are covered by other elements of the rate, particularly the transmission adder. But the transmission adder ignores the effect of the EIQ policy. Grant's evidence itself says that the EIQ policy will result in delays of years, if not forever, before any new cryptocurrency miners come into Grant County. And that element of the rate is completely justified by the supposed influx of new crypto miners, including or causing upgrades to the system. Plaintiffs here are existing customers. They would see no benefit from that. They have no cause for that. Could I just, taking a step back for a moment, the standard of review for rate making requirements seems very deferential under Washington law, that they're presumptively reasonable. They're invalid only if excessive and disproportionate, as long as there's a practical basis for the rates that's sufficient. I was looking to see whether there was any case where Washington had invalidated electrical rates as discriminatory or unreasonable. And in your adjudication, so not really an electrical rate making. Are there cases where Washington has said that a rate, electrical rate making was unreasonable? And if so, what was the basis for that? So I'm not aware of a case involving a PUD, but there are certainly cases involving the Utilities and Transportation Commission, which regulates the private entities where they conclude that the rate increases imposed by the UTC... So Washington has been very deferential to... There has to be a, you know, even by the deferential standards, there has to be a rational basis for the... Well, they gave a rational basis, right? Everything that Judge Pena just listed and said, we need to have these additional costs. We're going to make a new class and here's the practical basis for creating this new class. And so there has to be something wrong about that. And I didn't really see why that wasn't a practical basis for raising rates. So here's what's terribly wrong about that. This ignores the new facilities policy, but Grant is requiring all new customers, all new major customers to pay up front for any new transmission capacity. So if there is an influx... Southern California Edison is really mean to me and they're always putting me into tier three, but I'm not sure why having to pay more, even when I think it's unfair. It's not just having to pay more, it's that those costs are already covered by the PUD's policy. If these future cryptocurrency customers show up at all, which is a major question because of the EIQ policy, they're going to be required to pay all the costs of upgrades to the transmission system that are required to serve their load. So charging my plaintiffs, who are current customers, who don't benefit from that transmission upgrades and who don't cause the transmission upgrades is not only unfair to my plaintiffs, but also constitutes a double recovery. So we're being forced to pay for transmission facilities that are only needed for future customers. The future customers will be required to pay for those same facilities. You've argued they could grandfather you in with a rate schedule, but nothing in Washington law obligates them to do that, right? So the problem with the grandfathering argument is that the district court concluded that grandfathering is not permitted. And that obvious legal error caused her to overlook or even not to address all the evidence that the rate class established here, which just covers cryptocurrency miners, is irrational because it assumes that all cryptocurrency miners can just leave the county, which is not the case. Mike, the plaintiffs here have invested over $15 million in facilities that are not mobile, and that the investment will be destroyed if this rate increase goes into effect. And in addition, they base the rate category on supposed business and regulatory risks that are supposedly unique to cryptocurrency, but the record is absolutely clear that they're not unique to cryptocurrency. All the large businesses that are served by Grant County face those risks. In particular, the cryptocurrency, or excuse me, the polysilicon industry, if you compare the charts of volatility that are in our brief, there's really no distinction between the cryptocurrency industry and the polysilicon industry in terms of the risks that it presents to Grant County in terms of the volatility of the price of the ultimate output of that industry. And so it was arbitrary to say cryptocurrency represents risks that are not represented by other industries and charge us a much higher rate based on that risk judgment than other industries that present the same risks are charged. Do you want to save some time for rebuttal? Yes, I do. Thank you, Your Honor. Good morning, Your Honors. May it please the court. I'm Dale Johnson on behalf of defendants and appellees in this case. In response to your question regarding the irreparable damages prong of the preliminary injunction, I would draw the court's attention to the quantum of evidence contained in one of the declarations proffered by the appellants in this case. And under the law that we've cited, that is clearly not the standard. The Supreme Court of the United States has said that monetary damages alone are not sufficient to establish irreparable harm. And if all that is required is a conclusory statement that an entity may suffer these damages, may go out of business, may go bankrupt, then it essentially would be an exception that would swallow the rule. And the judge who is given discretion to weigh these issues concluded that it was not significant enough to meet the appellant's burden to establish irreparable harm. Now, nothing is impossible, but this case presents an extreme case of nearly insurmountable hurdles for the appellants for good reason. We start out with the fact that they're seeking a preliminary injunction, which is, as you know, an extraordinary and drastic remedy, rarely given, and for good reason. This case hasn't been adjudicated. No substantive motions have been heard. No trial has occurred. No evidence has been presented other than in the form of the record, which was significant, and the party's declarations. Thus, it's difficult to establish that they qualify for all four prongs of the test. You layer on... Yes, sir. Forgive me for interrupting. It may not be material, but didn't the district court get it wrong when the court said that Section 20 does not apply to Grant County? Absolutely not, Your Honor, and I would also note that it is immaterial, but this is not a Federal Energy Regulatory Commission jurisdictional case. But doesn't the substantive... I mean, I think that is understood under Section 813, I guess, but the substantive standard appears to apply. Why wouldn't the substantive standard apply? Is it because the power is not going into interstate commerce or what? Correct, Your Honor, and that's correct. The first jurisdiction has not been triggered because this is not power that's moving in interstate commerce. It's not regulatory rate making where there's a Although the district court, it seems to me, really overread the language in the Yakima Nation case. But as I understand it, your argument also is that even if the section applies, there's still no private right of action for rate payers. Our position, I think, fundamentally for the purposes of this appeal of this preliminary injunction matter is that it's an interesting intellectual argument as to whether the Federal Power Act applies or not. But as the court ultimately concluded for the purposes of determining whether a preliminary injunction should issue, the standard that would be in effect is one of unreasonable discrimination in the establishment of the rate. So the Washington court said, at first it said it applied Yakima Nation, but then it said in any event, the Washington state standard for reasonableness and the federal standard for reasonableness is sufficiently the same. Is that correct? That's correct, Your Honor. Again, for the purposes of determining the outcome of this motion, the court can assume that the standard is the same. That is, both Washington law and the Federal Power Act limit a rate maker's ability to engage in discriminatory rate making, unreasonable discriminatory rate making. So what the court did reasonably was to say, look, I don't need to get to this issue about whether the Federal Power Act applies or not because the standard is the same. And looking at the record, it is clear that the Grant County Public Utility District did not engage in discriminatory rate making. That is, they did not abuse their discretion based on the record before the court at the time of the motion. Let me just ask one more question about the applicability of Section 20. And it applies when the power enters interstate commerce. Opposing counsel says at least some of the power sold by Grant PUD enters into interstate commerce. First, do you agree with that? And second, does that mean that Section 20 is applicable only to that power or is it It could be possible that Grant County Public Utility electricity, that is, the electricity that is generated at the two dams on the Mid-Columbia River owned by the PUD, could enter into interstate commerce and be subject to FERC regulation, but not this power. The rates we're talking about here are retail rates. The power is generated at the Priest Project. I didn't see, maybe I missed it, I didn't see where you raised this interstate or non-interstate argument below. The judge went off on her reading of the Yakima Nation case, not on anything to do with whether, in fact, this was strictly intrastate. I believe that's correct, Your Honor. We had briefed, to assist the court in its analysis, we briefed the Yakima case. Obviously, its reasoning is instructive, although not binding on the district court or certainly on this court. And that was the focus of our argument below. I was simply responding to the court's question. But again, at this stage, the court's conclusion that it could use the standard, the unreasonable discriminatory standard set forth in the FPA, for purpose of argument, leads to the same result. And that is, there was no arbitrary rate making that occurred here. And that's certainly an issue that the district court will have to wrestle with as we move forward in this case, through motions, practice, or otherwise. As the court is aware, Grant County PUD is a small public utility in central Washington that was formed in the 1960s when the small agricultural community, consisting primarily of farmers and residents and small businesses, boldly went forward and financed and permitted and built dams on the river. And those dams have been providing a source of inexpensive and reliable power for many years. But in recent years, entities that have been chasing relatively cheap power have moved into Grant County and have presented challenges to the county, to the PUD, I should say. And this is what this case all comes back to. And that is that in 2017, while there had been a bow wave of cryptocurrency miners, including some of the plaintiffs who had come into the county, there was an overwhelming and unprecedented number of inquiries from cryptocurrency miners for which they were requesting power service. And so Grant County did two things. And Grant County, as you know from the Grant County, I'm sorry, I should say the PUD, operates pursuant to the general authority as provided under RCW 54.16.040, which provides it with the full and distribution rate, services, prices, et cetera, very broad authority. They were forced, the PUD, the PUD commission was forced to act. And it acted in two ways. First of all, it was confronted with such a large number of inquiries. It simply had to come up with a way to prioritize how to treat them so it could... What about the argument that plaintiffs are all existing customers and they're paying their way now? And why should they be required to shoulder additional costs by outsiders coming in, new customers? Because the plaintiffs, based on the analysis of the Grant PUD commission and its staff, are part of a larger class of an emerging industry that is the cryptocurrency industry, Bitcoin miners, who have several like characteristics. That is, they present economic risk based on their operations, they confront regulatory risk, and together they comprise a concentration of demand from the utility that reasonably puts them in the same category. That is a rate class. And rate classes are derived from those unique characteristics. It doesn't mean they have to be identical. That is, there are agricultural rate classes. There may be potato farmers in that rate class. There may be apple farmers in that rate class. They may face different kinds of challenges in their various agriculture enterprises. But they're similar enough that the PUD acting within its discretion under the law can group them together and charge them the same rate. And that's precisely what happened here. So the fact that somebody had their foot in the door first doesn't necessarily mean that they shouldn't appropriately be placed in a different rate class with others who are engaged in the business and in the estimation of the PUD pose the same risk. That's precisely what happened here. So when this challenge, when they were confronted with this challenge of all these applications, or I should say expressions of interest from cryptocurrency miners in 2017, they exercised, they being the PUD, exercised its authority under the law to establish a queue policy, which Mr. Christensen referred to briefly at the outset of his argument. That queue policy, in effect, puts cryptocurrency miners at the back of the line to allow the PUD to manage the influx of requests. It's a way of triaging these requests. They had the authority to do that and they did it. And then they engaged in a nine-month, nine-to-12-month process to determine how to best deal with the unique challenges that are posed by this particular industry. That resulted in the establishment of the emerging industries rate class and rate schedule 17 that's the subject of this challenge. The result was that the plaintiffs and other people, nobody likes to pay higher rates, at least I don't think so. But that doesn't make the decision of the PUD arbitrary and capricious and it doesn't create a constitutionally protected interest such that this rises to the level of the denial of a federal or state due process right. And the state, the district court correctly concluded that given the high standard from which it had to evaluate the law and its application to the facts here, that these plaintiffs could not meet each prong of the preliminary injunction standard, that they do not enjoy a protected, constitutionally protected interest in a given rate or in an un-arbitrary rate that has been recognized by any federal court and therefore they're not entitled for the preliminary relief they're seeking. They were correct and that is the district court was correct. It did not abuse its discretion. We would ask this court to affirm the district court's decision. You have some time for rebuttal. So there are five different elements of this rate. If you look at the cross subsidy that plaintiffs are being forced to disgorge, that's more than half the rate and there's no basis for that rate other than a transfer of wealth from plaintiffs to defendants, plaintiffs to their favored industries within Grant County. The only justification that we could find in the record is the staff's perception that the type of customer or what our customers and governance want in terms of discounts and premiums is the basis for this. That's a political judgment, not substantial evidence that justifies this rate increase. That's more than half of this rate increase. It's a confiscatory rate increase which violates the plaintiff's due process rights under a century of precedent laid out in our briefs and that means even if you disregard the economic harm and the threat of bankruptcy to the plaintiffs that there's irreparable injury to their constitutional rights just based on this one element of the rate and that establishes the irreparable injury prong of the rate in any event. It's also illegal under Washington law under the statute that the PUD is permitted to or is required to charge rates that are fair and non-discriminatory except as authorized for low income senior citizens. If you read that provision, it's RCW 7438070, it says the utilities are authorized to provide utility services at reduced rates but only for low income and senior citizens. There's no authorization to provide reduced rates to favored customers in the irrigation industry or in residential customers which is what the PUD is doing here. So just viewing that element in isolation, this rate is the elements of the of the preliminary injunction standard here. To address your honors questions on section 813 of the Federal Power Act, it is triggered when any part of the power sold from a licensed hydroelectric project is sold in interstate or foreign commerce. That's absolutely the case with Grant. The the forequarters we cite demonstrate that power from is not traveling in interstate commerce. Do you disagree with that? I disagree with that. The power, anytime the power travels in interstate commerce, it affects interstate commerce. Is the power being generated and sold to your clients traveling in interstate commerce? Well, the power travels where it travels. It travels on an interstate grid. The power that plaintiffs are served with could come from anywhere on that interstate grid. And the triggering event for section 813 is whether power travels in interstate commerce. It's not whether power travels in interstate commerce and is sold to a particular customer. Once you establish that power is sold in interstate commerce, then section 813 applies and it bars, categorically bars, unjust discriminatory rates, declares them to be unlawful. The only question is who gets to enforce that. The rest of the section talks about if there's state regulation, then FERC doesn't have jurisdiction. That's the only question that the Yakima and the other cases that Grant relies on address. The rest of this, the provision says in the case where there is state regulation, FERC doesn't have anything to do with it, but it provides an explicit statutory remedy that provides for judicial review in the U.S. district courts, the same as happened under the Interstate Commerce Act back in the day. That's exactly the power that we're exercising here. So yes, section 813 applies. It applies a much stronger non-discrimination standard than under state law that was clearly violated here for the reasons we discussed. You're over time now. Thank you. Thank you. The case of Block Tree Properties LLC versus PUD number two of Grant County is submitted and we are adjourned for this session.
judges: Ikuta, Bennett, Rakoff